## WALSH, Commissioner, *v.* PRESTON.

## PRESTON *v.* WALSH, Commissioner.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TEXAS.

Argued March 13th and 14th, 1883.—Decided November 19th, 1883.

*Equity—Final Decree—Jurisdiction—Texas.*

Prior to 1844, the Congress of Texas authorized contracts to be made for settling emigrant families on vacant lands to be designated in the contracts. Subsequently, that Congress passed an act to repeal this law, and presented it to the President of Texas for his signature. He vetoed the repealing act. Congress then passed it over the veto. While the repealing act was thus suspended, the President contracted with one Mercer and associates to settle families on a designated tract, capable of identification. Preston, the appellant in one suit and appellee in the other, was assignee under Mercer. In February, 1845, the Congress of Texas enacted that on failure of the associates to have the tract surveyed and marked by the first day of the next April, the contract should be forfeited. In October following suit was begun to have the contract annulled for non-compliance with these provisions. A decree was entered declaring it forfeited, but it did not appear that proper service of the subpœna, or other process or notice, was made to give the court jurisdiction. After lapse of several years, suit was brought against the commissioner of the land office of Texas to obtain certificates for location of land for which claim was made under the contract, either within the limits of the grant, or in case the land there had been appropriated, then land of equal value elsewhere. The bill also prayed for an injunction to restrain the commissioner from issuing patents for lands outside the grant, until the claims under the contract should be satisfied. The defendant denied the principal allegations of the bill, and demurred on the ground that the State of Texas had not been made a party, averring that it was a necessary party. The court below found for the plaintiff on the facts, and made a decree enjoining the commissioner and his subordinates forever from issuing patents within the boundaries of the contract tract except to Preston or his order : *Held,*

1. That the decree was defective in not defining specifically the rights of the plaintiff in the land ; in not adjusting the conflicting rights of Texas and the plaintiff ; and in tying up forever the hands of the government and all other interested parties without affording final relief.

2. That as the court could give no affirmative relief, and in the absence of the State of Texas could not settle its rights in the tract, it was without jurisdiction.
3. That even if the court had jurisdiction, the case was without equity on the merits.

Bill in equity to compel the delivery of patents of public land in Texas. The facts appear fully in the opinion of the court.

*Mr. John Mason Brown* and *Mr. George M. Davie* for Preston.

*Mr. A. J. Peeler* for Walsh.

MR. JUSTICE MILLER delivered the opinion of the court.

These cases as they stand on our docket are cross-appeals from the decree of the Circuit Court of the United States for the Western District of Texas, in a suit wherein William Preston was plaintiff, and William C. Walsh, in his character of commissioner of the general land office of the State of Texas, was defendant.

The suit was commenced originally by George Hancock, a citizen of Kentucky, by a bill in chancery against John S. Groos, who was then commissioner of the land office, and after the death of Hancock, was revived in the name of Preston as plaintiff, and Walsh became substituted for Groos as his successor in office. The original bill is long, and after Preston became plaintiff he filed a very full amended bill.

To these the defendant demurred, and the demurrers being overruled, the defendant Walsh filed his plea in bar and his answer, under oath, to which there was a replication.

The bill is founded on a colonization contract between the State of Texas and Charles Fenton Mercer; a class of contracts well known in the history of Mexico, resting on a policy which was continued by Texas after separation from that government.

The contract on which the present suit is brought is dated January 29th, 1844, and is signed by Samuel Houston, president of Texas, and Charles F. Mercer, for himself and such associates as he may choose, and is attested by Anson Jones, secretary of State.

In making this contract the president acted under authority of an act of the Congress of Texas of February 5th, 1842, which declared,

" That the provisions of an act entitled ' An Act for the granting of lands to emigrants,' approved January 4th, 1841, so far as relates to the authority thereby given to the president to enter into a contract with W. S. Peters and others to introduce colonists, upon certain terms therein expressed and set forth, be, and the same are hereby, extended to such other company or companies which may be organized for like purposes, as the president in his judgment may approve.

" 2. That all the rights accruing to said company by the provisions of said act, and all the duties, obligations, and conditions imposed by the same upon the said W. S. Peters and his associates, be and the same are hereby extended to such other companies as may be organized under the provisions of this act."

To the act of 1841, therefore, we are to look for the kind of contract which the president of Texas could make in 1844 with Mercer and his associates, for though a joint resolution of the Congress, dated January 16th, 1843, is relied on as introducing some modification of the act of 1841, that resolution seems carefully limited in its operation to contracts already in existence, and does not affect the power of the president in any contract he may make with other parties.

It is true this joint resolution authorizes an extension of the period within which the contracts, to which it specifically refers by name, may be performed, from three years to five years, and the contract in Mercer's case allowed five years, when the act of 1841 required performance within three years; but no point is raised that the Mercer contract is, for that reason, void, and we are not called on to declare the effect of this departure from the act of 1841 in this case.

This agreement is in conformity with the act of 1841 authorizing the contract with W. S. Peters and his associates, and as a substantial summary of the material parts of the Mercer contract, except the location of the land and the names of the parties, that statute is given here.

The first three sections of the act relate to the rights conferred on all immigrants to the State.

Sec. 4 enacts that the president of the republic be and he is hereby authorized to make a contract with W. S. Peters, Daniel S. Carroll, and others (naming them), collectively, for the purpose of colonizing and settling a portion of the vacant and unappropriated lands of the republic, on the following conditions, to wit:

"The said contractors on their part agree to introduce a number of families, to be specified in the contract, within three years from the date of the contract : *Provided*, They shall commence the settlement within one year from the date of said contract."

It then proceeds :-

"Art. 2009. [5] *Be it further enacted*, That the said contract shall be drawn up by the secretary of State, setting forth such regulations and stipulations as shall not be contrary to the general principles of this law and the Constitution ; which contract shall be signed by the president and the party or parties, and attested by the secretary of State, who will also preserve a copy in his department.

"Art. 2010. [6] *Be it further enacted*, That the president shall designate certain boundaries, to be above the limits of the present settlements, within which the emigrants under the said contract must reside : *Provided, however*, That all legal grants and surveys that may have been located within the boundaries so designated previously to the date of said contract, shall be respected ; and any locations or surveys made by the contractors or their emigrants on such grants and surveys, shall be null and void.

"Art. 2011. [7] *Be it further enacted*, That not more than one section of six hundred and forty acres of land, to be located in a square, shall be given to any family comprehended in said contract ; nor more than three hundred and twenty acres to a single man over the age of seventeen years.

"Art. 2012. [8] *Be it further enacted*, That no individual contract made between any contractor and the families or single persons which he may introduce, for a portion of the land to which

respectively they may be entitled, by way of recompense for passage, expense of transportation, removal or otherwise, shall be binding, if such contract embrace more than one-half of the land which he, she, or they may be entitled to under this law; nor shall any contract act as a lien on any larger portion of such land; nor shall any emigrant be entitled to any land, or receive a title for such land, until such person or persons shall have built a good and comfortable cabin upon it, and shall keep in cultivation, and under good fence, at least fifteen acres on the tract which he may have received.

"Art. 2013. [9] *Be it further enacted*, That all the expenses attending the selection of the land, surveying, title, and other fees, shall be paid by the contractor to the persons respectively authorized to receive them : *Provided, however*, That this provision shall not release the colonist from the obligation of remunerating the contractor in the amount of all such fees, so soon as it can be done without a sale of their land : *And further*, The president may donate to every settlement of one hundred families, made under the provisions of this act, one section of six hundred and forty acres of land, to aid and assist the settlement in the erection of a building for religious public worship.

"Art. 2014. [10] *Be it further enacted*, That the president may allow the contractors a compensation for their services, and in recompense of their labor and expense attendant on the introduction and settlement of the families introduced by them, ten sections for every hundred families; and in the same ratio of half sections for every hundred single men introduced and settled; it being understood that no fractional number less than one hundred will be allowed any premium.

"Art. 2015. [11] *Be it further enacted*, That the premium lands must be selected from the vacant lands within the territorial limits defined in the contract ; *And further*, All fees incidental to the issue of patents for lands acquired under the provisions of this law shall be paid to the commissioner of the general land office, for the use and benefit of the public treasury.

"Art. 2016. [12] *Be it further enacted*, That a failure on the part of the contractors, and a forfeiture of their contract, shall not be prejudicial to the rights of such families and single persons as they may introduce ; who shall be entitled to their respective quotas of land, agreeable to the provisions of this law.

"ART. 2017. [13] *Be it further enacted*, That the contractors shall be required to have one-third of the whole number of the families and single persons for which they contract within the limits of the republic before the expiration of one year from the date of the contract, under the penalty of a forfeiture of the same ; and it shall be the duty of the secretary of state forthwith, after the expiration of such term, and failure on the part of the contractors to comply with this provision, to publish and declare said forfeiture ; unless the president, for good and sufficient reasons, shall extend the term six months, which he can do; and all substitutions of families living within the limits of the republic, by the contractors, shall not entitle them to any premium for such families, nor shall it operate in favor of them, for the number of families which they are bound to introduce.    And this act shall take effect from and after its passage."

The contract with Mercer designated a large tract of land, about six thousand square miles in extent, the outer boundaries of which were described so as to be capable of identification by survey, within which he was to settle at least one hundred families within each period of a year for the five years succeeding the date of his contract, and the right to introduce new emigrants terminated at the end of that time.

What he was to do under this contract, and what he was to receive for it when done, as found in the instrument executed by him and the president, differ but little from the requirements of the foregoing statute.    Where there may be found any difference material to the view we take of this controversy it will be pointed out in the course of the opinion.

The complaint, after setting forth this agreement, alleges that Mercer performed the obligations imposed on him, introducing and settling within the prescribed limits and within the five years allowed him twelve hundred and fifty-six (1256) families, and that in all other respects he fulfilled the obligation of his contract.    It charges that for all this he has received no lands at the hands of the State, as he is entitled to, nor any evidence or certificate of his right to them, and that the State of Texas and the officers in charge of the land department deny all right of said Mercer or Hancock, his assignee, or Preston,

Hancock's devisee, or any of their associates, to receive such lands or such certificates, or any compensation for the services rendered under Mercer's contract in colonizing the families so introduced.

And it is specifically charged against the defendant that, as commissioner of the general land office having charge of such matters, he not only utterly refuses to recognize their rights and refuses to issue to them patents or certificates for the number of sections and half sections to which they are entitled, but that he is constantly issuing to others land certificates and patents, whereby the land within the reservation in which their claims must be satisfied is rapidly passing into the hands of private owners with title from the State.

The prayer of the bill is that defendant Walsh, by a mandatory injunction, be required " to refrain and desist from longer withholding from your orator the certificates for location of land to which your orator is entitled under the contract between Charles Fenton Mercer and the Republic of Texas, of date of January 29th, 1844. and from further refusing to execute and deliver to your orator the certificates for land to which on final hearing it may be decreed that your orator is entitled;" and if it be found there is not land enough within the bounds of the Mercer colony grant, remaining free from occupancy, sufficient to satisfy the orator's claim, that he may, by appropriate decree, receive certificates from the defendant for lands of equal value by way of recompense for lands wrongfully alienated to others. It is also prayed that the defendant and all his subordinates be enjoined and restrained from doing any act whereby there may issue any patent, certificate, plat, grant, survey, or location of lands outside and beyond the limit of the Mercer grant, save only to your orator, and until complainant's just claims are satisfied.

The answer of the defendant denies that the contract is a valid contract, alleges that in a suit by the governor of the State of Texas in a court of competent jurisdiction, against said Mercer and his associates, the contract was by a decree of that court annulled and declared void, and all rights under it forfeited, and relies on that decree in bar of the present suit.

He denies that Mercer or his privies ever performed their obligations under the contract, and denies that they ever introduced into the State and settled on the land described any immigrants or colonists, and expressly denies that the 1256 families found in the Crockett list, on which complainant relies, were introduced or in any manner brought into Texas by Mercer or his associates. He denies that he ever surveyed the outside boundaries of the grant, or made the surveys into sections or half sections which he was bound by his contract to make, by which alone could the settlements, houses and improvements of the settlers, or any of them, be.so identified or described as to entitle complainant to receive certificates or patents for them, or for the premium lands mentioned in the contract.

The plea and demurrer rely on the incapacity of plaintiff to maintain against this defendant the suit in which the State of Texas is a necessary party, when the State is not made a party, and cannot be made a party in that court.

The decree of the court, after the introduction of much testimony, documentary and otherwise, and after full hearing, declares :

"That complainant's allegations are found to be true, and supported by proof, and that the defendant and all his subordinates of any description are restrained and prohibited and forever enjoined from issuing or delivering to any person or corporation any certificates, patents, or plats for any land within the boundaries of the Mercer colony as set forth in the bill, except to complainant, William Preston, or to such person as he may in writing direct."

It further decrees that defendant and all his clerks and subordinates are enjoined from hindering or obstructing said Preston or his agents in the surveying, selecting, platting, recording, entering, or claiming any and all lands lying within the limits and boundaries of the so-called Mercer colony ; and they are also enjoined from hindering, obstructing, preventing, or delaying the said Preston, and his associates, from performing, completing, and perfecting all the several conditions, duties,

obligations, and acts devolving upon him, the said Preston, or said association, under the terms and stipulations of the colonization contract. And it orders that defendant pay the costs of the litigation.

It is not very easy to see on what principle this decree can be sustained.

There is no decree by which the right of plaintiff to any specific land is affirmed, nor to any ascertained quantity of land to be located generally.

There is no attempt, as there can be none in this suit, to adjust the conflicting rights of the State of Texas and the plaintiff in this land. There is no attempt to define the number of acres to which the plaintiff is entitled, or what he is yet to do, or what he *may* do, to perfect his right to any land whatever.

And yet, without establishing any such right or deciding what plaintiff may yet do to establish a right, the hands of the government are tied absolutely as to all the vacant land which belongs to it within the colony limits. Not only are the hands of the government thus tied, but other persons having rights, inchoate or vested, in those lands, with undisputed claims to patents, to certificates, to surveys perhaps, are all arrested in the precise condition they may be at the time this decree was rendered. The whole land-office business and functions of the commissioner within that colony, no matter whose interests are involved, are paralyzed by this decree. And what is more, they are paralyzed forever; for the language is that the commissioner and all his clerks, agents, &c., are enjoined *forever* from doing the forbidden acts.

This is also done in a case where the court, having exhausted its powers (for the decree is final), has found itself unable to grant any positive relief to plaintiff, gives him no land, no certificates, no right to land in other places, but leaves him also suspended, except what he may do now to perform the obligation which the contract imposed upon him. The time within which he was to do all that the contract required or permitted him to do expired by its terms January 29th, 1849, now nearly thirty-five years ago. We can see nothing whatever in the case by which he can now be authorized to do with effect what

he was required to do within the five years his contract was in force. Can he now introduce and settle colonists in a country filled with an active population? Can he now survey and cul-tivate the land and build the cabins which he did not survey, settle, and improve then? Can he, after the vast vacant prairies which he then agreed to convert into homes for families have been covered by a population of thousands, perform in that same territory, where now are thriving cities, the things he bound himself to do thirty-five years ago, so as to secure the lands rendered valuable by the enterprise of others?

If he can do none of this; if the court can give him no affirmative relief; if it has no other jurisdiction of this case but to tie up everybody's hands and preserve forever the present status of things, why should it do that?

A court of equity will not thus do a vain thing, the only effect of which is to embarrass thousands of people without a hearing or an opportunity to assert what they claim to be their rights, and tie the hands of a great State in dealing with her public lands, in a suit to which she is not a party.

But the plaintiff below insists, by his appeal from this decree, that the circuit court should have granted him the relief which he prays, and especially insists that for every hundred families of the twelve hundred and fifty-six which he located in the limits of his grant, there should now be issued to him certificates, which he may locate on the vacant lands within the contract limits, or, if they cannot be found, then on other vacant lands of the State.

We will examine into the merits of this claim.

It must be remembered that this examination is made on proceedings in a court where the real party in interest is not before it, and over which that court has no jurisdiction. That if the decree asked for is rendered, it must be satisfied out of the property of this party. That the circuit court, in under-taking to control the State of Texas in the disposition of its public lands, by a decree against one of its officers, is, in ef-fect, rendering a decree of specific performance against the State.

But waiving this for the present, we proceed to inquire

whether, if the State were before this court as an ordinary party, plaintiff has made a case for specific performance.

It must be confessed that Texas, both as an independent republic and as a State of the Union, did all she could to prevent the making of this contract, and since it was made has denied its validity and refused to do anything under it, and has always denied any such performance on the part of Mercer and his successors and associates as entitled them to any rights under it if it be valid.

The contract bears date January 29th, 1844, and on the next day, January 30th, 1844, the Congress of Texas passed a statute repealing all laws authorizing the president to make colonization contracts, and forfeiting such of those already made as had not been complied with by the contractors. The legislative history of this repealing act shows that it had been presented to the president and vetoed, and while the matter was thus suspended the contract was signed the day before Congress passed the bill over his veto, which terminated all power in him to make such contracts. The aversion with which this contract was received has never been removed from the minds of the governing authorities in that State, and its Congress, on the 3d February, 1845, passed the following joint resolution:

" Joint Resolution to establish the limits of the Mercer Colony.

"ART. 2245. [1.] *Be it resolved by the Senate and House of Representatives of the Republic of Texas in Congress assembled,* That General Charles Fenton Mercer and his associates be, and they are hereby, required to have the lines of their colony land actually surveyed and marked by the first day of April next.

" ART. 2146. [2.] *Be it further resolved,* That a failure to comply with the provisions of the above section shall work a forfeiture of their contract.

"ART. 2147. [3.] *Be it further resolved,* That no person shall be recognized as provided for in said contracts who were not specially introduced by the said contractors, so far as the premium lands are concerned ; but the citizens so introduced shall be entitled to the same amount of lands as though they had been introduced, as provided for in said contract ; and that this act take effect from and after its passage."

On the 11th day of October, 1846, the suit of the governor of the State against Mercer and his associates was commenced in the District Court of Navarro County, in which a decree was rendered September 25th, 1848, declaring the contract null and void on the verdict of a jury. Of this decree it is as well to say now, that while it would, if valid, dispose of the whole case, we are not satisfied, in the absence of personal service on the defendants and of any personal appearance by them, that there was such substituted service by publication as gave the court jurisdiction. The decree, therefore, is no bar to the rights of the present plaintiff, and the matter is here referred to as showing the unvarying hostility of the State authorities to this contract.

Mr. Mercer was, by these proceedings and many others found in the statute book of the State, put upon his guard that in order to establish any rights whatever under that contract, he must comply strictly and promptly with all the conditions and obligations which it imposed upon him.

In order to see exactly what it was that Mercer and his associates undertook to do, it may not be amiss to inquire for what purpose Texas desired the settlement of these colonists on her lands. This policy of colonization is one which Mexico had inaugurated long before Texas separated from that confederacy. It was founded on the idea that the government was abundantly rich in lands and deficient in population; that it owned large bodies of vacant lands which were rather a trouble than a profit, as resorts of Indians and beasts of prey, while they were much in need of an active and industrious agricultural population.

In the case of Texas it was desirable also that this population should be fighting men, as they were in a state of smouldering war with Mexico, which might break out at any moment, as that government had not acknowledged the independence of Texas, and still asserted dominion over that country—an assertion which led to the war a year or two later between Mexico and the United States.

What Texas desired then, in these colonization contracts, was, first, an accession to her population capable of military duty;

second, the settlement of this new population on her large tracts of vacant lands; and, third, that this should be done in a manner which would add to the value of those which would remain.

The first obligation, therefore, which the contractors, under the 4th section of the act authorizing the contract with Peters and others assume is, that they agree " to introduce a number of families to be specified in the contract within three years from the date of the contract."

The persons thus to be introduced are always spoken of in the statute as emigrants, and the 13th section contains a provision " that all substitution of families living within the limits of the republic by the contractors shall not entitle them to any premium for such families, nor operate in favor of them for the number of families which they are bound to introduce."

In the first clause of the contract now under consideration, after the recital of the authority by which it is made, Mercer agrees to introduce and settle within the limits hereafter described, and in accordance with the provisions of the act aforesaid, and within five years from the date hereof, as many *emigrant* families as he and his associates can settle within said limit.

Throughout this contract also the persons to be so introduced and settled are spoken of as emigrant families.

Another provision of the contract, in defining what shall constitute a family, speaks of males over seventeen years of age. And still another requires the contractors " to cause each male emigrant of the age of seventeen years and upward to be supplied and bring with him a good rifle, yager, or musket, and a sufficient supply of ammunition; and the party of the second part (the contractors) shall keep on hand, at all times, in some convenient place of deposit, such quantity of prime ammunition as will supply to each male emigrant of the age of seventeen years and upwards, settled by them, not less than one hundred rounds."

It was another condition of this contract that the contractors should survey the outside lines of the land within which they were to settle these emigrants, " and cause the unappropriated lands within the prescribed limits to be surveyed, as needed

for purposes of settlement, into sections of six hundred and forty acres, or half sections of three hundred and twenty acres, each, at his option, and shall cause to be built log cabins, &c., &c.   For each family so settled the contractors were to receive a section of six hundred and forty acres, or two half sections of three hundred and twenty acres.   But these were to be located on alternate sections as they were surveyed and numbered, and the other alternate sections were to remain to the republic; thus introducing the system which the government of the United States has adopted in all her railroad grants, of reserving every alternate section, that it might profit by the increased value which these sections acquired by the settlement of an agricultural population in their midst.

What compliance has plaintiff shown with this first and most important duty of *introducing from without the republic emigrant* families and settling them upon lands within the limits prescribed by the contract?

We feel constrained to say that there is no satisfactory evidence to our minds that Mr. Mercer, or any of his associates, or any agent of his, ever introduced into the State of Texas a single family from without the State, or that any such family ever came into the State by means of any request or any offer of help, or of land, or of any inducement offered by Mercer or his associates.

The first piece of evidence offered on the subject is a list of 119 names, with corresponding numbers on the left of the column, a statement at the head of the column called "Date of Introduction," then the names of the heads of the families, and in another column the names of the witnesses.   These witnesses are, with a single exception, P. J. Pillans, Thomas C. Bean, and James Hilhouse.

This list of names is signed to a statement that they have each received of Charles Fenton Mercer and his associates a certificate, issued in accordance with Mercer's contract with the State, and that the families have been introduced and settled in manner and form as expressed in the contract.   These certificates are nowhere introduced or found in the record, nor is a copy of any one of them produced.

The parties signing this paper do not state that they were emigrants from abroad introduced into the State by Mercer or his associates, and none of them swear to the statement which they sign. Daniel Rowlett, who describes himself as one of the Texas Association, and Pillans and Bean, who say they are disinterested persons, each make affidavit at the end of the list that it contains a true and accurate statement of emigrant families introduced and settled by Charles Fenton Mercer and his associates upon and within the limits of the Mercer grant.

But the deposition of Pillans in regard to this list is taken, and he swears that he got up the list and issued the certificates to the parties found by him on the lands when he went there in 1844 as the agent of Mercer, and to others who came afterwards, until he left in May, 1845. He is asked in a long and pointed cross-interrogatory if he knew where these settlers came from, who introduced them, &c., &c. To this he answered as follows:

"Many of the queries herein I cannot now, nor could I at any time, have answered. I rarely, if ever, knew where the colonists came from, or what induced such to come to the colony. The first that came selected grounds in the northeastern part of the colony, east of the Sabine River. They built, under contract with us, their own cabins, brought their own arms, but a large supply of ammunition was stored ready for distribution, bought by General Mercer. I presume the colonists came at the solicitations of the colony agents elsewhere, and because land could then be had without price. After I had ceased to be the agent I never entered the colony, save, perhaps, when riding through some portion of it when on a journey."

No deposition of Bean or Rowlett is found in the record.

A deposition of Richard T. Berchett is taken for plaintiffs, who says he was one of Mercer's associates in the contract, and was intimate with him, but says he knows nothing about the introduction of colonists by Mr. Mercer.

An effort is made to prove an advertisement by Mercer of his colonization scheme and its inducements to emigrants, making

it an exhibit in the interrogatories filed for several witnesses; but each of them says he knows nothing of the paper, nor can it be inferred from anything in it whether it was a circular or a newspaper advertisement, or what circulation it ever had.

With the exception of Crockett's report, which will be presently considered, this is about all that can be called evidence of the introduction by Mercer, or through his agents or associates, of emigrants into the State of Texas.

The report of John M. Crockett, of 1,256 families settled within the colony limits, which is introduced by plaintiff and relied on by him exclusively as giving the number and names of the emigrants for whose settlement he claims land under the contract, was, as it states on its face, made under the act of February 2d, 1850, of the legislature of the State.

It is manifest from a perusal of that act that it was designed, as its title imports, "for the relief of the citizens of Mercer's Colony," and that it was in no sense either a recognition of the validity of Mercer's contract or of his performance of its conditions.

"Section one enacts that every colonist, or the heirs or administrators of such colonists, citizens of the colony of Charles Fenton Mercer and his associates, on the 28th of October, 1848, shall receive the quantity of land to which such colonists may be entitled, to wit, 640 acres to each family and 320 acres to each single man over the age of seventeen years : *Provided, That nothing herein contained shall be construed so as to place the contractors of said colony in a better condition in regard to the State of Texas than they would be if this law had not been passed.*"

A commissioner is to be appointed to hear proofs and to decide who is entitled to lands, and to issue to them certificates, which may be located on vacant lands within the colony.

Sec. 8, which prescribes what is necessary to be proved to entitle the party to a certificate, is as follows :

"ART. 2316. [8] That to entitle the colonists to the benefits of this act, they shall be required to prove, by their own oaths, supported by the oaths of two respectable witnesses, that they emigrated to Texas and became citizens of said colony prior to

the twenty-fifth of October, 1848; that they are citizens thereof; that they have performed all the duties required of them as citizens ; and said applicants shall also swear that they have never received any land of this government by virtue of their emigration hither : *Provided*, That they shall not be required to prove that they have cultivated land."

Here is no requirement that the parties shall have complied with the conditions of Mercer's grant, and no consent of Mercer required, nor even any condition that they should have been introduced by Mercer or settled under his contract. It is not even required that they should have come to Texas or settled in the colony within the five years during which his contract was in force; but if they immigrated to Texas any time before 1848, though it had been twenty years before his contract was made, and became citizens of the colony before October, 1848, their claim was respected.

And the fifth section declared "that no change shall be made in the boundaries of the surveys of settlers, whether they be with or without the consent of the contractors, so that the boundaries thereof are justly and definitely marked."

Provision is also made for appeal by the claimant from the decision of the commissioner, but never a word of recognition of any legal right of the contractors or of their contract as furnishing the rule of decision.

The report itself contained no allusion to Mercer or his contract or his associates, except as a designation of the locality in its heading, thus :

" Record of certificates issued to citizens of Mercer's colony, concluded 30th September, 1851, by John M. Crockett, commissioner."

Here follows a list of 1,256 names, with the quantity of land for which a certificate has been issued by him, Crockett, to each ; in every instance 640 or 320 acres, but no description or definite location of section or half section.

At the end Crockett swears that the foregoing is a full, complete, and correct list and description of the certificates issued by him to the settlers of said colony.

There is not here the slightest evidence that these men were brought to Texas by Mercer or any of his associates, or that he placed them on this land, or that he or they belong to the class which his contract required, or that he or they performed the conditions of that contract or any of them. And as the statute under which Crockett acted did not require proof of compliance with the Mercer contract, the inference that they had been so introduced is of little, if any, force.

It is quite remarkable that no attempt is made by plaintiff to prove that any of these settlers were introduced into Texas or settled on this land under his contract. The period when such settlement must have been made, if at all, was only about thirty years before the beginning of this suit, and in an agricultural community there must have been at the time this suit was tried many of the four thousand persons of whom these settlers were composed still living, whose testimony could have been procured. They could have told when they came to Texas, and who brought or sent them or induced them to come, and when and how they came to settle within the limits of this colony grant. They could not only have spoken for themselves, but for the body of the settlers who came about the same time. It is significant that plaintiff has wholly neglected to avail himself of this testimony, which, if in his favor, was the best to be had, since he has no documentary evidence which is satisfactory, though the archives of the State have been open to the inspection of himself and his agents.

Nor does the inference which the absence of this and other satisfactory evidence forces on the mind stand upon its mere absence, for the defendant has introduced some strong negative evidence of that character.

Mr. Crockett's testimony is taken by the defence, and a large number of the names found in his report are given in an interrogatory, and he is asked in others if any of these were settlers in Mercer's colony, and if he knows the date when they became settlers, and by whom they were introduced, to which he answers he has no means of knowing the date of their settlement.

To other interrogatories he answers that he went upon the

ground among the different settlements to facilitate the settlers in their proofs according to the act under which he was appointed; that the general opinion among the settlers was, that there was no validity in the claims of the Mercer colonists, as such, and the settlers did not base their claims to lands on Mercer's colony-contract, believing that Mercer had forfeited his claims under it. That, he says, was the opinion, without exception, as he recollects. They thought he had failed in not surveying the lands or performing any other act stipulated in his contract.

To the 17th interrogatory he answers:

"It was the common report in the colony in 1849 and 1850 that Mercer and his associates had done nothing in the settlement of the country, in the surveying of the lands, furnishing houses, ammunition, &c.; but it was then understood that the settlers had located there without the aid of Mercer and his associates, and that they had no connection or relation with Mercer and his associates. The settlers had their own land surveyed. During all my visit I never heard a settler in Mercer's colony claim that he was introduced or brought into the country by Mercer or his associates, or base his claim to lands under the Mercer colony contract."

These were the men on whose introduction and settlement plaintiff relies altogether to prove his performance of that contract, and not one of whom has he called as a witness to that performance.

The defendant also took the deposition of John A. Harlan, who came to Texas in 1846, and settled in Navarro County, within the limits of the colony, and resided there twenty-one years. He says a good many persons came with him from Illinois at that time and settled in Navarro County. He says they came and settled of their own accord, brought their own guns and ammunition, built their own houses, and had nothing to do with Mercer in coming to the colony or in settling there, and he remembers the names of twenty men over seventeen years old of that class. In answer to a cross-interrogatory, he says he never knew of any effort of Mercer to settle the colony.

The defendant also took the depositions of P. P. Martin and H. W. Young, both of whom were settlers in the colony. Young says he came to Texas in 1843. He says his father set- tled in the colony before the contract with Mercer was made. Martin says he came to Texas from Tennessee in 1846, to the northern part of the Mercer colony. No one induced him to do so. He was introduced to Mercer, but had no conversation with him about the colony.

Mr. Terrill, a surveyor by profession, says a great many families settled in the colony during the years 1844, 1845, and 1846. Some of them claimed to be colonists and some were old Texans. He was surveying in the colony during these dates, and never knew or heard of Mercer or any of his associates assisting any settler in any way.

While there is this failure to prove satisfactory performance of the main obligation to introduce emigrants into Texas and settle them on the grant, and this testimony of witnesses on the ground that it was not done, there is a total absence of proof of an important condition in regard to the surveys.

We are of opinion that the outer boundary of the grant was surveyed so as to comply substantially with the contract in that respect. But the obligation to survey the land into sections and half sections, which Mercer undertook in the agreement, so that the settlers could know and identify that to which they became entitled, and so that the republic could know which were her alternate sections and half sections, and sell them to others, and so that both parties could know where the premium sections for each one hundred families, to which the contractors might become entitled, could be located, all of which, we think, were essential parts of the contract, remained wholly unperformed.

There is not the slightest evidence of such surveys by Mercer or his associates in the record. Mr. B. J. Chambers, a witness for plaintiff, who was a professional surveyor residing in Texas, says he made an agreement with Mr. Mercer to sectionize or survey certain lands for him in Navarro and Ellis counties, west of the Trinity River, and, at his request, accompanied him into the bounds of the grant. But he says he did not do any

surveying or any work for Mercer or his associates. He adds:

"I did not do it, because I was advised by nearly all the settlers I saw not to do it ; that Mercer had not assisted them in their settlement in any way."

And this is the nearest approach to sectionizing these lands, as Mr. Chambers calls it, which the record discloses.

The importance of this matter can be readily seen now. If the court should be of opinion that all these settlers reported by Crockett were colonists under a compliance with his contract by Mercer, and if, as plaintiff claims, the contract is a grant *in præsenti*, how can either Mercer, or these colonists through him, have a decree for specific performance by an instrument which will carry a legal title to land described by metes and bounds as sections and half sections, would enable the court to do if the necessary legal surveys had been made? Plaintiff does ask for such relief. If they had surveyed this land, and settled the colonists on the enumerated sections and half sections of such surveys, they could now name the section and half section for which they ask a decree.

If they had made these surveys, and had settled each of their colonists on a distinct section or half section, which could be thus identified as his cabin and improvement, and had performed the other conditions of introducing these settlers as emigrants from abroad, the argument that the present case comes within that of *Davis* v. *Gray*, 16 Wall. 202, would have more force. In that case the railroad company to which the grant was made had made the necessary surveys, and the track of the road having been definitely located through those surveys, the sections and parts of sections to which they were entitled were specifically identified without any difficulty, and the officer was restrained from certifying or patenting them to others.

In the present case, while the circuit court seemed inclined to grant similar relief, it found itself unable to do so for want of these very surveys, which the plaintiff's predecessor had

promised to make as an important part of the contract now relied on as the foundation of the relief sought.

If this were a case between individuals, there could be no doubt of the decision which a court of equity would be compelled to make on this application for specific performance. The failure on the part of the party applying for it to perform his own part of a contract wholly executory, or to show any sufficient reason for the failure, has always been held to be ground to refuse relief and turn the party over to his action at law.

What has the plaintiff or his predecessors done to secure his title to the lands now prayed for? Almost nothing. If we are correct in holding that he introduced no emigrants and made no surveys, what else has he done? Has he or they given any time or labor in earnest effort towards the business? If so, the evidence of it is not found in the record.

Have they spent any money in the enterprise? A feeble attempt to show an outlay of $12,000 or $15,000 is made, but by no means successfully. If plaintiff were now suing in an action for damages before a jury, and he had proved a right to recover, the sum which he could get for his services and expenditures under the testimony in this record would be small indeed compared to the magnitude of the claim here set up.

We do not think it necessary to consider the argument that the contract is a grant *in præsenti*, with title to the land in the plaintiff, nor the idea that there is a trust by which these lands are held for his benefit, and that this trust is in some way made stronger by the legislation under which the Republic of Texas became a State in the Union.

In any view that can be taken of the contract, it was when made wholly executory. Mercer had not then paid anything or done anything to entitle him to land. It was all to be earned by actions to be performed thereafter. The republic conveyed him no title. It was a mere executory contract for the sale and purchase of land, in which the price was to be paid within five years, and the lands so earned, an unknown quantity, were to be then conveyed by an instrument called a certificate.

The total failure of Mercer to perform left him no rights

under the contract. The State seeks nothing against him for non-performance, and so the affair is ended.

The plaintiff and his predecessors in interest have not only not performed, but they have not shown any sufficient excuse for non-performance. They have not, in the language of the authorities, shown themselves ready, willing, and able to perform. On the contrary, they have permitted the matter to rest for thirty years without an effort to do so, and now, if they would, the state of matters in the colony is so changed that it is impossible that they can perform their agreement.

The result of these views is, that

*Upon the appeal of Walsh the decree of the circuit court is reversed and the case remanded, with directions to dismiss the bill, and this necessarily disposes of the plaintiff's appeal.*

MR. JUSTICE HARLAN, with whom concurred MR. JUSTICE FIELD, dissenting.

Mr. Justice Field and myself differ from the court in our view of the facts of this case, and therefore dissent from its judgment.

The circuit court found that the complainant had satisfactorily established the contract between the Republic of Texas, through its president, and Charles Fenton Mercer and his associates, as alleged in the bill and amended bill; the entrance of Mercer upon the duties devolving upon him under the contract; the organization of the Texas Association; the appointment of surveyors and colonization agents; the running of lines and surveys; the introduction of one hundred and nineteen families within the first year of the grant; the making of the survey of the boundary limits of the colony grant by April 1st, 1845; the settlement of twelve hundred and fifty-six families within the limits of the colony prior to October 25th, 1848; the appointment of Mercer as chief agent and trustee for the association; the subsequent appointment of Hancock as chief agent; Hancock's death and the appointment of Preston, ratified by the association, as chief agent; the entrance of those persons upon the performance of their duties as agents of the association, and the activity displayed by them, respectively, in furthering the

objects and interests of the colony and the association; the employment of counsel; the expenditure of money; and the persistent applications made to the political departments of the State of Texas for relief. It further found that Mercer, as agent, made reports to the government of Texas, as required by the contract, up to and for the year 1847; that Mercer is dead long since; and that all his papers and documents, among which were copies of his correspondence and reports in relation to the Mercer colony, have been lost and destroyed.

The evidence adduced by the complainant has, it seems to us, been subjected by this court to the same rules of strictness and technicality which would be applied to an indictment for a criminal offence. We are of opinion that the circuit court did not misapprehend the effect of the testimony, and that a case is made entitling complainant substantially to the relief granted in the decree below.

By the contract between Mercer and the Republic of Texas the latter agreed to convey to the former and his associates, or their legal representatives, one section of 640 acres of land, or two half sections of 320 acres, for each family which they should introduce and settle upon the lands set apart for colonization by Mercer and his associates; each alternate section or half section of 640 or 320 acres being reserved to the republic, to be purchased or not by Mercer and his associates on certain stipulated terms. It was also agreed that a perfect title should be made in the usual mode and form to Mercer and his associates or their legal representatives, for each section, half a section or other fractional part of a section to which they became entitled under the contract, and that the same should be conveyed to the parties as soon and whenever they should exhibit to the commissioner of the general land office of the republic, or other proper officer thereof, in the manner and form prescribed in the contract, the evidence of having surveyed the portion of land for which such conveyance was desired, and that there were comfortable small houses or cabins erected thereon, and families residing therein who had been settled thereon by Mercer and his associates or their legal representatives.

The Republic of Texas further agreed that Mercer and his

associates should receive, as further compensation for their services and for their labor and expense in introducing and settling the families provided for in the contract, a premium of ten sections of 640 acres or twenty sections of 320 acres of land for every hundred families introduced and settled as required; further, that upon Mercer and his associates paying into the public treasury twelve dollars, and obtaining the treasurer's or other proper officer's receipt for that sum paid into the same, and also of the delivery for cancelment of any bonds, promissory notes, or other audited liabilities of the republic to the amount of $640, they or their legal representatives should be entitled to demand and should receive from the government a full and absolute title to 640 acres of the reserved alternate sections. The right to purchase the alternate sections was, however, made to depend on certain conditions, which, in the view taken of the case by the court, need not be here set out.

It was provided in the contract that whenever Mercer and his associates, or their authorized agent or legal representative, " shall exhibit to the commissioner of the general land office of the republic a certificate, under oath, subscribed by two witnesses, and certified by some person qualified by the laws of Texas to administer an oath, that the said parties of the second part, or their legal representatives, have caused to be built a small comfortable house or cabin, or any number of such houses or cabins, on the parcel or parcels of land which they are obligated by this contract to convey to each family, or the several families respectively, and have actually settled a family or several families respectively therein, they shall immediately receive thereafter a full and absolute conveyance from the government of the republic for as many sections of land of 640 acres, or half sections, or other fractional parts of sections equal in amount to 640 acres, as there shall be families certified to in such certificate or certificates."

It was further provided that the unlocated lands included in the boundaries described in the contract should remain and be held by the government of the republic for the purposes set forth in the contract, until the end of five years from its date, and " shall be considered as set apart, *exclusively of all future*

*claims,* to be colonized in the manner aforesaid, by and for the benefit of the party of the second part and of this republic."

It was also stipulated that unless Mercer and his associates, or their legal representatives, "shall, prior to the first of May, 1845, have introduced and settled on the land above mentioned, according to the tenor of this contract, one hundred families, all right and title of the party of the second part, or their legal representatives, to proceed further in the execution of this contract shall cease and determine from the moment of such default; but such default shall not work or operate retrospectively, but leave to the party of the second part, and all persons claiming under them, whatever right, title, or interest they may have acquired from the action of the party of the second part and their legal representatives prior to such default, to the same extent as if no such default or failure had occurred; and in like manner, and under like qualifications, the right of the said party to proceed further under this contract shall cease and determine provided 250 families be not introduced and settled by them, in manner aforesaid, on or before the expiration of two years from the date hereof; and so in like manner 150 additional families shall be settled on the said lands, according to the terms of this contract, by the said parties of the second part or their legal representatives, within each of the three remaining years, or the right of the said party to proceed further under this contract, through the full term of five years from the date hereof, shall, on the occurrence of any default as aforesaid, utterly cease and determine; provided, as before expressed, no such default shall operate otherwise than prospectively, either in relation to the second party to this contract, or to the emigrant families actually settled, or any person or persons claiming by, through, or under them, or any of them."

To what extent did Mercer and his associates comply with their contract? The inference to be drawn from the opinion of the court is, that the record furnishes no evidence whatever that Mercer and his associates did anything of a substantial character entitling them to the benefit of their contract with the Republic of Texas. But we are of opinion that this is an

erroneous view of the evidence. We cannot avoid the conclusion that the contrary is abundantly shown by the record. That Mercer and his associates introduced and settled one hundred and nineteen families prior to the first day of May, 1845, the evidence leaves on our minds no reasonable doubt. There was produced from the records of the general land office of Texas, certified by the commissioner of that office, a copy of what is styled the original agreement or covenant, signed by the heads of that number of families, showing the date of their introduction into and settlement upon the Mercer colony lands, the signature of each emigrant being duly witnessed.

That agreement is in these words:

"This instrument witnesseth, that the persons who have subscribed and undersigned their names hereto do hereby severally, but not jointly, agree and covenant as follows, to wit:

"That each of us has received of Charles Fenton Mercer and his associates, known as and comprising the 'Texas Association,' a certificate issued in accordance with a contract made on the 29th day of January, A.D. 1844, between them and Sam. Houston, then president of the Republic of Texas, acting in behalf of the said republic, authorizing them, among other things, to introduce and settle emigrant families upon the lands within the limits specified in said contract; the number and date of each certificate granted by said association, and by us received, being expressed and written in spaces to the left hand of our respective names, which certificates are received and held for the benefit of the respective families mentioned therein, each one of us forming a member of the family described in the certificate delivered to him, *which families have been specially introduced and settled at the times and in manner and form as stated and expressed in said certificates respectively by the said Mercer and his associates, and have emigrated as the said certificates declare and show.* And in consideration of the premises and the benefits from said certificates and the contract aforesaid, accruing and to arise, that we will severally observe and perform, as far as may be in our power, the several duties and requirements devolving upon us as settlers under said contract, whether prescribed by the terms thereof, or by the laws of the land in such behalf especially.

We bind ourselves severally not to give, sell, or in any way furnish to any Indian any spirituous liquor, nor any gunpowder, lead, or fire-arms, or warlike weapons of any description ; and, moreover, to abstain from any waste or trespass upon the half sections adjoining those on which we have respectively settled, and on the whole sections adjoining thereto, and to guard the same from waste or trespass by others, and to protect the same from settlement by any other persons not authorized to settle thereon by the said association, or some legally authorized agent thereof ; and to pay the sum of five dollars in materials, labor or money, towards the building of a school-house, of such dimensions and on such site as the said association or its agent may direct. Also that each family specified or referred to herein, each one certifying alone for his own family, has and occupies a suitable cabin or house as described in said contract ; and that each male member thereof of the age of seventeen years and upwards is supplied with a good rifle, yager or musket, and a sufficient supply of prime ammunition."

This paper was supported by the signatures and the oath of one of the Texas Association and two disinterested persons, to the effect that the list contained " a true and accurate account and statement of emigrant families as certified to by the heads thereof to have been specially introduced and settled by Charles Fenton Mercer and his associates, known as and comprising the Texas Association, prior to the 1st day of May, 1845, upon and within the limits of the grant made by the Republic of Texas to said Mercer and his associates on the 29th of January, 1844, and referred to in the certificate subscribed to by the heads of the families respectively," &c. The record contains no evidence that the Republic of Texas by any of its officers ever made any objection to this certificate as defective either in form or substance. It brought the work of Mercer and his associates, as to these 119 families, within the terms of that portion of the contract already quoted. They did " exhibit to the commissioner of the general land office of Texas a certificate under oath subscribed by two witnesses," under date of August 2d, 1845, and certified on the same day by a " person qualified by the laws of Texas to administer an oath," showing

that Mercer and his associates had caused to be built a comfortable house or cabin on the lands settled upon by said families, and showing also that they had actually settled said families on the lands for which they received the certificates mentioned in the agreement between Mercer and such settlers. The criticism which is made in the opinion of the court upon the language of this agreement and certificate impresses us as exceedingly technical. It is said that the parties signing it do not state that they were *emigrants from abroad* introduced into the State by Mercer or his associates; they, however, do state and certify that they have each received a certificate in accordance with the contract of January 29th, 1844, describing it as one which authorized Mercer and his associates " to introduce and settle *emigrant* families upon the lands within the limits specified in said contract;" and they certify that they were " specially introduced and settled," as set forth in the certificates, and that they " have *emigrated* as the said certificates declare and show." That the persons who signed that agreement did not mean to certify that they emigrated from a State or country without the Republic of Texas is a suggestion which it did not occur to the attorney-general of Texas, in his very elaborate brief, to make. It is for the first time found in the opinion of this court. That Pillans, one of the persons who verified under oath the certificate relating to these 119 families, did not know " where the colonists came from," is a fact of no consequence; nor was it material to inquire from what particular State or country, other than Texas, they came. Pillans in his affidavit refers to them as " emigrant families," meaning thereby that they came from without the Republic of Texas. We have been unable to find any evidence that the persons embraced in these 119 families did not go to the Mercer colony tract from some place outside of Texas, and there is no suggestion to that effect in the argument of counsel.

It is said that none of these persons made oath to the papers they signed. Our answer is, that neither the contract nor the law of Texas required any such oath, but only the oath of two witnesses.

It seems to us that the complainant has made a clear case as

to the 119 families introduced by Mercer and his associates prior to May 1st, 1845.

The next inquiry is as to the effect to be given to the report of John M. Crockett in 1851. That report was made under the authority of an act of the legislature passed February 2d, 1850, the first section of which provided that "every colonist, or the heirs or administrators of such colonists, citizens of the colony of Charles Fenton Mercer and his associates, on the 25th of October, 1848, shall receive the quantity of land to which such colonists may be entitled, to wit, 640 acres to each family, and 320 acres to each single man over the age of 17 years: *Provided*, that nothing herein contained shall be construed so as to place the contractors of said colony in a better condition in regard to the State of Texas than they would be if this law had not been passed." In this language we have a distinct recognition of the fact that there was, at the passage of that act, a body of citizens in Texas known as "citizens *of the colony of Charles Fenton Mercer and his associates*," and that, as "*such colonists*," they were entitled to a certain quantity of land. Persons within the limits of the Mercer grant, who did not settle there in pursuance of some arrangement with Mercer and his associates, could not have been regarded as citizens of "the colony of Charles Fenton Mercer and his associates." Nor could such persons have been described as of that colony and *entitled*, as "such colonists," to receive 640 acres, or any other quantity, of land, unless they had entered upon the land under the contract between the Republic of Texas and Mercer and his associates. The proviso in the section quoted does not at all militate against this view. That only shows the purpose of the State not to give "the contractors of said colony" any advantage they did not then have under their contract with the republic.

The next section of the foregoing act provided for the appointment by the governor, by and with the advice and consent of the senate, of a commissioner, "whose duty it shall be to *hear proof* and *determine* what *colonists* shall be entitled to land as aforesaid; and said commissioner shall issue to parties entitled to the same, or to the heirs or legal representatives of such

parties, certificates for *their proper quantity* of land." Plainly, the purpose of the legislature was, through that officer, to ascertain who were entitled to land in virtue of the contract with Mercer and his associates. It was in violation of the contract for the State to thus pass over the contractors and treat directly with the colonists, but it is none the less clear that she proceeded upon the basis of giving land only to those who were " of the colony of Charles Fenton Mercer and his associates." The official report of Crockett contains the names of all such persons. His action was judicial in its nature, and his determination as to who were entitled to land as colonists aforesaid, was a determination that Mercer and his associates had complied with their contract to the extent, at least, of the persons named in his report. The State gave land to all persons reported by Crockett as of the Mercer colony, and, consequently, she was bound by her contract to compensate Mercer. By the articles of her annexation to the United States it was provided that she shall " retain all the vacant and unappropriated land lying within her limits, to be applied to the payment of the debts and *liabilities* of the said Republic of Texas, and the residue of said lands, *after discharging* said debts and *liabilities*, to be disposed of as such State may direct." Her liability under her contract with Mercer was one of the liabilities for the discharge of which she was bound to apply the unappropriated lands within her limits. Had the articles of annexation been silent as to the debts and liabilities, and made no provision as to the unappropriated lands of the Republic of Texas, and had the United States taken such lands, then, according to the settled principles of public law, they would have been bound to meet the debts and liabilities of the late republic, at least such as had been made a charge upon its public property. To avoid all difficulty upon that subject, it was expressly stipulated in the articles of annexation that Texas should retain her public lands, with power to dispose of them *after* discharging the debts and liabilities of the republic, and that " in no event are said debts and liabilities to become a charge upon the government of the United States." Thus was created, by treaty between the United States and the Republic of Texas, an express trust for the benefit of those

to whom the latter, at the time, was indebted or under liability. The agreement between the United States and Texas constituted, within the meaning of the Constitution, a contract, the violation of which, upon the part of the officers of that State, it is competent for the courts to prevent.

In the opinion of the court it is stated, among other things, that, since the contract was made with Mercer, Texas, both as an independent republic and as a State of the Union, has "denied its validity and refused to do anything under it." There is a serious obstacle in the way of our acceding to the correctness of this statement. It is found in the decision of the Supreme Court of Texas in *Melton* v. *Cobb*, 21 Texas, 539. Referring to this colonization contract with Mercer, that court said :

"That the contract of the 29th of January, 1844, if valid, reserved the land in question from location and appropriation by the plaintiff's certificate, cannot be doubted. But it is insisted that the contract was invalid, for the want of authority, on the part of the president of the republic, to confer on the grantee the benefits contemplated by the joint resolution of the 16th of February, 1843. He undoubtedly had authority under the act of the 4th of February, 1841, and the amendatory act of the 5th of February, 1842, to contract with the grantee to colonize vacant lands of the republic for that purpose, and to set apart and reserve from location the territory within certain boundaries, which he should designate, for the period of three years from the date of the contract."

Referring to the act of February 3d, 1845, copied in the opinion of this court, the Supreme Court of Texas said:

"This act cannot be regarded as anything less *than a virtual ratification by the government of the act of its agent in making the contract, and its legislative affirmation of its validity* . . . The contract was *again expressly recognized and treated as an existing contract by the act of 25th June*, 1845, and these acts were passed prior to the plaintiff's location and survey. It is unnecessary to refer to more recent acts containing *similar recognitions of the validity of the contract*. It will suffice to say that

these legislative recognitions of its validity *must be deemed to have put that question at rest.* *Houston* v. *Robertson*, 2 Texas, 6; *Hancock* v. *McKinney*, 7 id., 384, 441–2."

In view of the grounds upon which the court rests its decision, it is unnecessary for us to discuss the extent of relief to which Preston is entitled.

For the reasons stated, we cannot assent to the opinion and judgment in this case.